IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RONNIE GULLY, JR., # B-88170, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 18-cv-539-NJR |
| ) | |
| DEREK HUNDLEY, ) | |
| TRENT RALSTON, ) | |
| RANDALL D. BAYLOR, ) | |
| BASNETT,[1] and ) | |
| GIVENS, ) | |
| Defendants. ) | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Ronnie Gully, an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated at Pinckneyville Correctional Center ("Pinckneyville"), brought this civil rights action pursuant to 42 U.S.C. § 1983.

## BACKGROUND

At all times relevant to the Complaint, Gully was an IDOC inmate housed at Lawrence Correctional Center ("Lawrence"). Defendant Derek Hundley was a Correctional Lieutenant; Defendant Trent Ralston was a Correctional Officer, Defendant Jeremy Givens was a Correctional Lieutenant, and Defendant Haley Basnett was a mental health professional employed by Wexford Health Sources, Inc.

This lawsuit concerns two separate incidents which occurred in October 2017. In

---

[1] Although originally identified by Gully as "Ms. Basinette," this defendant has since identified herself as "Haley Basnett." Thus, the Clerk of Court is **DIRECTED** to change her name on the docket sheet.

the first one, on October 11, 2017, Gully complained of breathing problems and chest pain to Ralston while they were on a line movement back from the chow hall at approximately 5:20 p.m. and requested medical attention. Ralston indicated he would see if a lieutenant could take Gully to healthcare after the inmates returned to the housing unit from the chow line. At Gully's request, Ralston secured Gully in the shower area so he could watch him until a lieutenant arrived.

Lieutenant Hundley later arrived to take Gully to the healthcare unit. Gully had previously sued Hundley over a December 2016 disciplinary ticket. (Doc. 1, p. 80); *Gully v. Hundley, et al.*, Case No. 15-cv-211-DRH-SCW (S.D. Ill.). Hundley ordered Gully to cuff up and asked why Gully hadn't done so when his officer ordered him to do so. Gully protested that he had never been given such an order, and that Ralston had locked him in the shower. Gully eventually cuffed up. Hundley allegedly threatened to write Gully "another ticket" if he was lying about his orders for breathing treatments. Gully claims that Hundley intentionally delayed getting him to healthcare against prison policy that called for a "code 3 medical emergency" response to symptoms of chest pain and breathing problems. (Doc. 1, pp. 80-81).

Gully arrived at the healthcare unit at 5:40 p.m. and was examined by a healthcare professional (Doc. 78, Ex. A, p. 111; Ex. H, p. 137-138). Although there is some dispute about what exactly transpired during that visit, Gully continued to move around and was talking during the assessment (Doc. 78, Ex. H, p. 138), and a number of questions went unanswered because Gully was "yelling @ security" and threatening staff. (Doc. 78, Ex. H, pp. 137-138). He was released from the healthcare unit that evening with

instructions to "put on MD line for [follow up] next week if cont[inue] to have [complaints] of chest discomfort." (Doc. 78, Ex. H, p. 137). He was then taken to segregation because he disobeyed a direct order to cuff up prior to being transported to the healthcare unit. (Doc. 78, Ex. A, p. 114).

The next incident occurred five days later, on October 16, 2017. Gully alleges in the Complaint that Basnett fabricated a report that he was suicidal, despite his "relentless" arguments that he did not want to kill himself. Gully claims that Givens threatened to call in the Orange Crush team to force Gully out of his cell, so Gully ultimately agreed to go to the suicide housing unit. He was placed in a cell that allegedly had urine, feces, and blood smeared on the walls, semen stains on the mattress, and a terrible foul odor. According to Gully, Basnett came to the suicide cell later that day and told Gully that she put him on suicide watch to teach him a lesson, because she heard of his situation with her friend Hundley, who has "a far reach." Although Gully alleged in the Complaint that he remained in the contaminated watch cell for 48 hours without clothes to protect him from the cold, he admitted in his deposition that he had a smock to wear, and the evidence now establishes that Gully was in the crisis watch cell for about 24 hours.

Following a merits review pursuant to 28 U.S.C. §1915A, the Court allowed the action to proceed on the following claims:

**Count 1:** Eighth Amendment deliberate indifference claim against Ralston and Hundley, for delaying Gully's medical treatment for his breathing problems and chest pain;

**Count 2:** First Amendment retaliation claim against Hundley for intentionally delaying Gully's medical treatment;

**Count 3:** First Amendment retaliation claim against Basnett and Hundley, for placing Gully in a filthy suicide-watch cell to punish him for suing Hundley;

**Count 4:** State law claim for intentional infliction of emotional distress against Basnett, for placing Gully in a filthy suicide-watch cell when he was not suicidal; and

**Count 5:** Eighth Amendment claim against Basnett and Givens for housing Gully in a suicide-watch cell contaminated with human waste and bodily fluids.

All defendants have now moved for summary judgment (Docs. 51, 54). Following the filing of these summary judgment motions, counsel was recruited to represent Gully (*see* Doc. 67), and counsel entered an appearance on August 26, 2019 (Doc. 69). Magistrate Judge Sison allowed counsel to conduct a limited amount of additional discovery needed to address the motions for summary judgment (*see* Doc. 73), and counsel filed responses to both motions for summary judgment on November 13, 2019 (Docs. 79, 80). Defendants Givens, Hundley, and Ralston filed a reply in support of their motion (Doc. 81), Defendant Basnett also filed reply to Plaintiff's response (Doc. 82).

## DISCUSSION

Federal Rule of Civil Procedure 56 governs motions for summary judgment. "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012) (quoting FED. R. CIV. P. 56(a)). *Accord Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord*

*Bunn v. Khoury Enterpr., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

**I.** *Count I—Eighth Amendment Deliberate Indifference—Ralston and Hundley*

Defendants Ralston and Hundley argue they are entitled to summary judgment on Count 1 because neither was deliberately indifferent to Gully's medical needs. Specifically, Defendant Ralston points to the fact that after Gully told him he was suffering from chest pains and shortness of breath while on line movement on October 11, 2017, Ralston told Gully he would contact the lieutenant and the healthcare unit when they got back to the housing unit. When they returned to the housing unit, Gully obtained his inhaler from his cell, and he was then placed in a secure shower while the lieutenant and healthcare unit were notified.

While Gully alleged in his Complaint that an hour passed between the time Ralston placed him in the shower and when Ralston and Hundley returned to take him to healthcare, the incident reports and medical records suggest that it was actually about 20-25 minutes between the time Gully was placed in the secure shower and when he was taken to the healthcare unit. (*See* Doc. 78, Ex. G—Sergeant Hanson arrives in HUC at 5:45

p.m. and Gully is already there; Ex. H, p. 137-138, medical record started at 5:40 p.m.) And, during this time, Gully admits he had his inhaler (his current prescribed medication for shortness of breath).

The Eighth Amendment prohibits cruel and unusual punishment and deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citation omitted). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). The first consideration is whether the prisoner has an "objectively serious medical condition." *Id. Accord Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Hammond v. Rector*, 123 F. Supp. 3d 1076, 1084 (S.D. Ill. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of serious harm") (internal quotation marks omitted)

(emphasis added).

The second consideration requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Id*. at 653. A plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409. Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Gayton*, 593 F.3d at 620).

Here, even assuming that Gully can satisfy the first prong and he was, in fact, suffering from a serious medical condition, there is simply no evidence that either Ralston or Hundley were deliberately indifferent to that condition. Gully admits that Ralston allowed him to get his inhaler (*see* Doc. 78, Ex. A, p. 106) before he placed him in the secure shower (which Gully requested—*see* Doc. 78, Ex. A, p. 105-106), and he had it the entire time he was in the shower (Doc. 78, Ex. A, p. 106). While Gully points to the fact that Ralston and Hundley testified they were not aware that Gully had his inhaler in the shower, the Court notes that they simply did not recall this fact one way or the other (Doc. 79, Ex. J, pp. 39-40; Ex. K, p. 47). And Ralston testified that he could have heard Gully if he had called to him from the shower (Doc. 79, Ex. J, p. 91), and Gully admits there were other inmates within earshot (Doc. 78, Ex. A, pp. 87-90).

Moreover, while 20 or more minutes may have passed between the time Gully was placed in the secure shower and when he was transported to the healthcare unit, there is

no evidence that the delay was caused by Ralston and Hundley knowingly or recklessly disregarding Gully's condition. Ralston has attested that he had to secure the remainder of the chow line before he could transport Gully to the healthcare unit. Gully admits that he doesn't have "the slightest idea" why it took Hundley some time (even if it was an hour, as Gully claims) to get to this cell. (Doc. 78, Ex. A, p. 107, line 4). And Gully also admits he doesn't know what Hundley was doing before he came or even what his duties at the time involved. (Doc. 78, Ex. A, p. 107, lines 6-11). While Gully tries to create a dispute about whether Ralston called the healthcare unit after placing him in the secure shower, it is undisputed that "the healthcare unit was called and [Gully] was eventually taken by wheelchair to the healthcare unit for treatment." (*See* Doc. 79, p. 3, para. 9, and related citations). Moreover, whether the healthcare unit was called first or not appears to be immaterial, because it is undisputed that Gully was in fact taken to the healthcare unit (again, whether it was 20 minutes or an hour, there is no dispute that he arrived there that evening and was treated).

And finally, perhaps most importantly, there is no evidence that any delay—whether it was 20 minutes or an hour as Gully alleges—caused Gully's symptoms to worsen or his medical issues to become more serious. In other words, there is simply no evidence in the records from which a jury could find that any delay caused Gully harm. A delay can amount to deliberate indifference if it exacerbates the injury or unnecessarily prolongs a plaintiff's pain. *Perez v. Fenoglio*, 792 F.3d 768, 777-78 (7th Cir. 2015). "In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than

the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (internal citations omitted). Gully fails to offer any such evidence. When Gully arrived at the healthcare unit at 5:40 p.m., the medical records reflect that he was talking and then yelling, threatening staff. (Doc. 78, Ex. H, p. 137-138). The nurse noted no signs of active cardiac issues, and Gully was able to move around and talk. Gully admits that when he got to the healthcare unit, medical staff took his blood pressure and vital signs and checked his breathing. (Doc. 78, Ex. A, p. 111, lines 15-22). Ultimately, he was discharged from the healthcare unit and put on the medical call line for follow up the following week. There is nothing in the record that suggests that any delay—caused by whatever the reason—resulted in any physical harm to Gully. Similarly, there is no evidence that the fact that Hundley ordered Gully to cuff up during the trip to the healthcare unit (whatever his reason for doing so) caused any harm to Gully.

Because there is no evidence that Ralston and Hundley acted with deliberate indifference when responding to Gully's medical need on October 11, 2017, they are entitled to summary judgment on Count I.

## II. *Count II—Retaliation—Hundley*

A prison inmate has a First Amendment right of course to file grievances, lawsuits, or otherwise complain about their conditions of confinement. *See, e.g.*, *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012); *Walker v. Thompson*, 288 F.3d 1005 (7th Cir. 2002); *DeWalt v. Carter*, 224 F.3d 607 (7th Cir. 2000); *Babcock v. White*, 102 F.3d 267 (7th Cir. 1996); *Cain v.*

*Lane*, 857 F.2d 1139 (7th Cir. 1988). To prevail on his claim of First Amendment retaliation, Gully must prove that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future"; and (3) a causal connection between the two. Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009) (citation omitted).

At the summary judgment stage, Gully "must show that he has evidence from which a reasonable jury could find that the defendant's knowledge of his protected activity was a substantial or motivating factor in [his] decision to take an adverse action against him." *Thomas v. Walton*, 461 F. Supp.2d 786, 796 (S.D. Ill. 2006).

Gully's first retaliation claim asserts that Defendant Hundley delayed taking him to get medical treatment on October 11, 2017, because of a desire to retaliate against him for filing and pursuing a lawsuit against Hundley. Gully did in fact file a lawsuit against Hundley in February 2017 (Case No. 17-cv-211-DRH-SCW), and it was pending at the time of the events described in his Complaint. That satisfies the first factor mentioned above and leads the Court to consider the second and third factors.

As explained with respect to Count I, however, any delay between the time Gully complained of his medical condition and the time he arrived at the healthcare unit was not caused by Hundley knowingly or recklessly disregarding Gully's condition. Again, whether it was 20 minutes or an hour, there is no evidence that Hundley took adverse action against Hundley by intentionally causing the delay. Stated differently, Gully has produced no evidence that retaliation was a substantial or motivating factor in Hundley's response to his condition or his transport to the healthcare unit. Even if there was

evidence of retaliation, which there is not, the Court finds that the alleged retaliation—a delay of 20 minutes or even 60 minutes to get to the healthcare unit—with no evidence of what caused the delay, would not rise to the level of a constitutional violation. As the Seventh Circuit has stated, "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). And finally, also as set forth above, there is no evidence that Gully suffered any sort of deprivation in connection with any purported delay in his treatment. Thus, Gully has failed to produce evidence of retaliation sufficient to withstand summary judgment on Count II.

### III. *Count III—Retaliation—Basnett and Hundley*

Gully's other claim for retaliation is that Basnett and Hundley place him in a dirty crisis watch cell in retaliation for the same lawsuit mentioned above. Defendant Hundley argues that he lacks sufficient personal involvement in the determination to place Gully in the cell to hold him liable on this claim. Bassett asserts that she had a valid reason for placing Gully in the cell (his threat of suicide), and Gully has produced no evidence that Basnett was aware of his lawsuit against Hundley. Moreover, Basnett argues that Gully merely speculates that there was some sort of personal relationship between Basnett and Hundley. Admissible evidence reflects, however, that they were not friends, they did not socialize or eat lunch together as Gully suggests and, in fact, they worked different shifts and were assigned to different housing units at the time of the allegations at issue in the Complaint. (Doc. 80, Ex. A, p. 8; Doc. 80, Ex. I, pp. 92-94).

Gully argues that there is a genuine issue of material fact precluding summary judgment because of several statements allegedly made by Basnett and Hundley about the reasons for placing Gully in the crisis watch cell. Specifically, he claims that Basnett told him she was placing him in the cell to "teach him a lesson" (Doc. 78, Ex. A, pp. 66, 67) and that Hundley was her friend and he had a "far reach [in the prison]" (Doc. 78, Ex. A, p. 67). And Gully claims Hundley made threats about burying him in segregation when he was escorting him to healthcare during the first incident on October 11 discussed above.

But even if the Court assumes that these statements were made by Basnett and Hundley, Gully could not establish the second and third elements of a retaliation claim. While his lawsuit against Hundley was certainly protected activity, there is no evidence he suffered a deprivation that would likely deter First Amendment activity in the future. As discussed below, even if the cell was contaminated as Gully contends, there is no evidence that Basnett or Hundley knew about those conditions. Basnett's role was limited to making the determination that Gully needed to be on crisis watch (she was not present when he was escorted there, had no control over which cell he would be placed in, and did not visit him until the next day when she removed him from crisis watch). Likewise, there is no evidence that Hundley was involved in the decision to place him there or in Gully's physical transfer from segregation to crisis watch. In fact, there is no evidence that Hundley even knew that Gully had been put on crisis watch.

Moreover, Gully was in the cell for approximately 24 hours, which is the earliest

time an inmate can be released from crisis watch after being placed there.[2] He was taken to the crisis watch cell from a segregation cell, a restrictive environment, in the same wing. A reasonable juror simply could not find that a person of ordinary firmness would be deterred by this brief placement. And, of course, Gully was not deterred from prosecuting the action against Hundley (which remains pending today) or filing another lawsuit against him.

Also, with respect to Hundley, there is likewise no evidence that he was personally involved in the decision to put Gully on suicide watch. Gully admits Hundley was not present on October 16, he does not know where in the prison he was working at the time, and he had not seen him since October 11. (Doc. 78, Ex. A, p. 65-66).

And, even if the Court assumes that Gully suffered a deprivation that would likely deter First Amendment activity in the future, he has failed to show a causal connection between the two. He produced no evidence that Basnett knew about the lawsuit which had been filed six months before, and he admits he had not had any issues with Basnett during that period of time. And, of course, Gully admits to having threatened Hundley just a few days before (on his way to healthcare), so it's a more reasonable inference that if Basnett made any statements suggesting that Gully should leave Hundley alone (which

---

[2] Although Gully claims he was not suicidal, the records show that he was placed there because he was threatening to harm himself, which the wing officer heard and reported to Lieutenant Givens. (Doc. 79, Ex. M, pp. 30-32; 76-78). Givens also testified that Gully threatened to harm himself, which is why mental health was called to his cell. *Id.* Basnett testified that she was already on the wing that day and personally heard Gully repeatedly yell, "I'm suicidal, I'm suicidal." (Doc. 80, Ex. G, pp. 27, 47). It is undisputed that when an inmate makes such statements, even if he immediately retracts them, mental health professional are required by law to place them on crisis watch. (Doc. 80, Ex. G, pp. 30-32).

she denies of course), it concerned the events of October 11, which had nothing to do with a First Amendment protected activity.

Defendants are entitled to summary judgment on Count III.

IV.  *Count IV—Intentional Infliction of Emotional Distress—Basnett*

This claim is based on the same facts underlying Count III—that Basnett placed Gully in the filthy suicide-watch cell without adequate clothing in chilly temperatures in order to "teach him a lesson"—not because he was truly suicidal. Under Illinois law, the tort of intentional infliction of emotional distress covers only acts that are truly "outrageous," that is, an "'unwarranted intrusion . . . calculated to cause severe emotional distress to a person of ordinary sensibilities.'" *Knierim v. Izzo*, 174 N.E.2d 157, 164 (Ill. 1961) (quoting *Slocum v. Food Fair Stores of Fla.*, 100 So. 2d 396 (Fla.1958)). *See Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001).[3] The tort has three components: (1) the conduct involved must be truly extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress; and (3) the conduct must in fact cause severe emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). To be actionable, the defendant's conduct "must go beyond all bounds of decency and be considered intolerable in a civilized community." *Honaker*, 256 F.3d at 490 (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992); *Campbell v. A.C. Equip. Servs. Corp.*,

---

[3] As noted in the threshold order, the Court exercises its supplement jurisdiction over this state law claim pursuant to 28 U.S.C. §1367(a), because it is a claim which "derive[s] from a common nucleus of operative fact" with the original federal claims brought under 42 U.S.C. § 1983. *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 936 (7th Cir. 2008).

*Inc.*, 610 N.E.2d 745, 749 (Ill. App. Ct. 1993). Whether conduct is extreme and outrageous is judged on an objective standard, based on the facts of the particular case. *Honaker*, 256 F.3d at 490.

Here, the Court simply does not find that Basnett's conduct rises to the level of extreme and outrageous. Even assuming the Court were to find that the cell conditions were as Gully describes in the Complaint,[4] there is no evidence that Basnett had any knowledge of the conditions of the cell. Gully admits he was taken to the cell by officers, Basnett was not on the wing when that happened (Doc. 78, Ex. A, p. 59), and Basnett did nothing to cause the conditions of the cell (Doc. 78, Ex. A, p. 64).

Moreover, there is simply no evidence that being in the cell caused Gully severe emotional distress. He claims he was "depressed" but admits that being in the cell only aggravated depression that he already had. In the end, Gully has failed to produce evidence that any worsening of his depression was caused by the cell conditions. His records reflect many pre-existing reports of mental health issues, including anxiety and depression, related to a variety of factors, including loss of his grandmother, not being able to see his nephew/son, and losing a best friend, just to name a few. After he was released from the cell, Gully did not report any emotional damage at all and certainly no severe emotional distress. Basnett is entitled to summary judgment on this claim.

---

[4] As Basnett's counsel points out, Gully's deposition testimony is inconsistent with his Complaint in that he admitted has was not naked but instead had a "turtle suit" described as a "smock" of sorts (Doc. 78, Ex. A, p. 61), and while there were mice in the cell, there are also mice throughout Lawrence (Doc. 78, Ex. A, p. 63). He also admitted that he did not have any contact with the alleged feces on the walls and couldn't say for sure whether he touched the dried urine or the semen (Doc. 78, Ex. A, p. 69).

V.  *Count V—Eighth Amendment Claim Concerning Conditions of the Cell—Basnett and Givens.*

The Eighth Amendment prohibition on cruel and unusual punishment forbids unnecessary and wanton infliction of pain and punishment grossly disproportionate to the severity of the crime. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Two elements are required to establish a violation of the Eighth Amendment's cruel and unusual punishments clause with regards to any conditions of confinement in prison. First, an objective element requires a showing that the conditions deny the inmate "the minimal civilized measure of life's necessities," creating an excessive risk to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective conditions must have resulted in an unquestioned and serious deprivation of basic human needs such as food, medical care, sanitation, or physical safety. *Rhodes*, 452 U.S. at 347. The second requirement is a subjective element—establishing a defendant's culpable state of mind, which is deliberate indifference to a substantial risk of serious harm to the inmate from those conditions. *Farmer*, 511 U.S. at 837, 842. The deliberate indifference standard is satisfied if the plaintiff shows that the prison official acted or failed to act despite the official's knowledge of a substantial risk of serious harm from the conditions. *Farmer*, 511 U.S. at 842. It is well-settled that mere negligence is not enough. *See, e.g., Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986).

Gully states that Basnett and Givens forced him into the suicide-watch cell, which was contaminated with human waste and blood-smeared walls, had semen stains on the mattress, and reeked of a foul odor. Although he alleged in the Complaint that he was

left in the suicide-watch cell for two days, it turns out that it was only about 24 hours. Assuming a jury believed Gully's testimony about the conditions of the cell (which is not certain based on the evidence discussed with respect to Count IV, above), he could meet the objective factor of posing an excessive risk to Gully's health. *See Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007) (prisoner held in cell for three to six days with no working sink or toilet, floor covered with water, and walls smeared with blood and feces); *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989) (inmate held for three days in cell with no running water and feces smeared on walls).

As to the subjective component of his claim, however, Gully has not shown that either Basnett or Givens were deliberately indifferent to the alleged conditions. When asked in his deposition whether he told Lieutenant Givens about the conditions of the cell, he said "No. I didn't see him afterwards." (Doc. 78, Ex. A, p. 100). He further testified that he "believe[s]" Givens knew about the conditions of the cell, but he bases that only on speculation because Givens "come and signs books on the wings and different things like that." *Id.* And Gully admits that other inmates likely caused the conditions, not any defendant. There is absolutely no evidence that Gully informed either defendant about the alleged unsanitary conditions or requested clothing or blankets to protect him from the cold. Defendants are entitled to summary judgment on Count 5.

## DISPOSITION

For the reasons set forth above, the Court **GRANTS** the motions for summary judgment (Docs. 51, 54). The Clerk of Court is **DIRECTED** to change the name of Defendant Basnett on the docket sheet as set forth in footnote 1, close this case, and enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:** March 30, 2020

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**